[Cite as *Hixson v. Ohio State Univ.*, 2012-Ohio-6313.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JAMES B. HIXSON

     Plaintiff

     v.

THE OHIO STATE UNIVERSITY

     Defendant

Case No. 2010-07334

Judge Joseph T. Clark
Magistrate Lewis F. Pettigrew

DECISION OF THE MAGISTRATE

{¶ 1} Plaintiff brought this action alleging discrimination in violation of the Americans with Disabilities Act (ADA). The issues of liability and damages were bifurcated and the case was tried to a magistrate of the court on the issue of liability.[1]

{¶ 2} As a child, plaintiff was diagnosed as being severely hard of hearing in both ears. He wears hearing aids, relies on reading lips, and he has a speech impediment. Plaintiff testified that he was employed by defendant, The Ohio State University (OSU), for 19.5 years, where he worked in several different positions. For example, plaintiff had previously worked for OSU as a maintenance repair worker (MRW) II and as a laboratory demonstrator in the geology department. His position in the geology department was eliminated due to a reduction in force (RIF). According to plaintiff, after the RIF, he assumed a "preferred status" for three to four months, during which time he was given a hiring preference by OSU. Plaintiff applied for many jobs at OSU. In late 2006, with his preferred status nearing an end, plaintiff contacted Scott Lissner, OSU's

ADA Coordinator, to help him find a job.  Lissner informed plaintiff that it was not his responsibility to find plaintiff a job but that he could assist him if he needed an accommodation during the application and interview process.  Even though plaintiff told Lissner that he did not need an accommodation, Lissner elected to assist plaintiff as he sought employment.

{¶ 3} Plaintiff testified that Donald Capps, who was employed by OSU as a Building Maintenance Superintendent II, Craig Knotts and Michael Mitchell interviewed him for a MRW I position, as well as an Electrician I position, at the Maintenance Rec Sports and Athletics Shop (MTRSA shop) in OSU's Facilities Operations and Development Department (FOD).  Plaintiff knew that the MRW I position required using a walkie talkie radio, and that he was unable to hear voices over a walkie talkie.  Plaintiff testified that during the interview he told the interviewers that they needed to face him when they spoke but that he did not mention the need for an accommodation regarding the walkie talkie.

{¶ 4} Plaintiff was hired as a MRW I as a probationary employee and began working in July 2007.  In the FOD MTRSA shop, Capps supervised 13 employees. Plaintiff testified that during the first month as MRW I, he worked Monday through Friday, but in August he requested a shift change to work Friday through Monday, so that he could spend more time with his wife.  Plaintiff testified that Mitchell was his immediate supervisor on the weekends and that Knotts supervised him one to two times a month.  Plaintiff explained that as a MRW I his daily work included completing "preventive maintenance" work orders (PMs), such as checking belts, filters and electrical connections, and he also performed emergency response jobs.

{¶ 5} Plaintiff testified that he attended a two-day "new employee orientation" one or two weeks after he began working for FOD.  The tables in the orientation room were

---

[1]On August 24, 2011, the court granted defendant's motion for summary judgment as to plaintiff's claims for breach of contract, wrongful discharge in violation of public policy, and promissory estoppel.

positioned in the shape of a "U" with the speaker standing in the middle of the tables. According to plaintiff, the first day of orientation ended at 3:00 or 3:30 p.m., and that the 40-50 employees attending the orientation were specifically told that they could go home and did not need to return to their job site. Peggy Barylak, an employee in FOD's human resource department, spoke during the second day of the orientation and testified that orientation ended around 1:45 or 2:00 p.m. Plaintiff testified that the second day of orientation also concluded around 3:00 p.m., but that he did not hear any instructions of what they were supposed to do, and he elected to go home instead of returning to FOD. Russell Brobst, an OSU employee for 30 years before retiring in 2009, also attended the orientation and worked with plaintiff. Brobst testified that the second day of orientation did not last the whole work day and when someone asked Barylak what they were supposed to do after the orientation Barylak told the group that they were supposed to return to their job location. Brobst testified that Barylak had her back to plaintiff when she made the announcement and that even he barely heard Barylak's response. Brobst stated that no other announcement was made, and when orientation ended plaintiff told him he would see him at work the next morning. When Brobst returned to the shop, Capps inquired about plaintiff's whereabouts and he informed Capps that plaintiff went home and that he believed plaintiff did not hear the announcement to return to the job site.

{¶ 6} Plaintiff testified that when he arrived at work the following day, Capps approached him to ask why he did not return to work the previous day. When plaintiff explained to Capps that he did not hear anyone say that he was supposed to return to FOD, Capps told plaintiff that he would receive a written corrective action. However, after a meeting with Peter Calamari, who was employed by OSU in 2007 as Assistant Director of Maintenance for FOD, a union representative, Capps, and plaintiff, Capps agreed to reduce the reprimand to a verbal warning.

---

However, summary judgment was denied as to plaintiff's ADA claim.

{¶ 7} Within a few weeks of plaintiff's employment as MRW I, Capps noticed that plaintiff did not respond to calls made to him on the FOD-issued walkie talkie radio. According to Capps, FOD employees use walkie talkie radios to communicate from the work site to the FOD building, and he estimated that they are used three to seven times per shift by each employee. Capps explained to the court that it concerns a supervisor when an employee does not respond to a call because it may mean that the employee is injured. Plaintiff testified that Capps approached him about not responding to calls on his walkie talkie radio and plaintiff testified that he was unable to hear the radio due to his hearing loss. Once Capps was made aware of the problem, Capps provided plaintiff with a microphone to wear on his shoulder which amplified the sound of the walkie talkie radio.

{¶ 8} According to plaintiff, a meeting was subsequently arranged with Capps and Lissner, to discuss an accommodation for his hearing loss and his inability to hear the walkie talkie radio. Plaintiff explained that he was evaluated by an audiologist in July 2007 and that in August 2007 the audiologist issued a report which recommended that plaintiff be issued a special T-4 cellular phone. Plaintiff received the phone on October 15, 2007.

{¶ 9} Capps testified that for the first four to six weeks of plaintiff's employment, plaintiff performed PM work orders with another employee to learn how to perform the jobs and both employees reported the same amount of time on the work order. Capps admitted that plaintiff's timekeeping records early in his probation were adequate. However, Capps testified that after about three months, he noticed an increase in the time plaintiff took to complete PM work orders. He explained to the court that he compared times for the same activities because the same PMs are performed every three months.

{¶ 10} In his performance review in mid-November 2007, Mitchell and Capps informed plaintiff that his performance did not meet expectations. Plaintiff's final written

performance evaluation states that he "does not meet" expectations in the categories of quality, quantity and timeliness, and communication. (Defendant's Exhibit Q.) Plaintiff was issued a probationary removal at the end of the probationary period effective December 8, 2007. Plaintiff testified that he is currently unemployed and receiving a disability retirement from PERS. Plaintiff alleges that defendant discriminated against him in violation of the ADA by basing its decision to remove plaintiff on plaintiff's performance before he received his accommodation.

{¶ 11} Former 42 U.S.C. 12112(a) states:

{¶ 12} "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[2]

{¶ 13} In a similar fashion, R.C. 4112.02 states, in part:

{¶ 14} "It shall be an unlawful discriminatory practice: (A) For any employer, because of the * * * disability * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 15} "To establish a prima facie case of discrimination under the ADA, a plaintiff must prove that '(1) [he] has a disability; (2) [he] was qualified for the job; and (3) that [he] either was denied a reasonable accommodation for [his] disability or was subject to an adverse employment decision that was made solely because of [his] disability.'" *Walser v. Ohio Univ.*, Ct. of Cl. No. 2003-03680, 2004-Ohio-4722, ¶ 8, quoting *Johnson*

---

[2]The current version of the ADA, as amended in 2008, provides, at 42 U.S.C. 12112(a): "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." As the events giving rise to plaintiff's claim occurred before the January 1, 2009 effective date of the ADA Amendments, the court will apply the statute in place prior to January 1, 2009. *See Carpenter v. Ohio Health Corp.,* S.D.Ohio No. 2:09-CV-965, 2011 U.S. Dist. LEXIS 113067 (Sept. 30, 2011).

*v. Mason*, 101 F. Supp.2d 566, 573 (S.D.Ohio 2000); *see also Talley v. Family Dollar Stores of Ohio, Inc.,* 6th Cir. No. 07-3971, 2008 U.S. App. LEXIS 19342 (Sept. 11, 2008), *Taylor v. Ohio Dept. of Job & Family Servs.,* 10th Dist. No. 11AP-385, 2011-Ohio-6060, ¶ 18-19.

{¶ 16} Under Ohio law, "[t]o establish a prima facie case of handicap discrimination, the person seeking relief must demonstrate (1) that he or she was handicapped, (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question." *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 571 (1998).[3]

{¶ 17} Defendant does not dispute that plaintiff has a disability and that plaintiff's probationary removal is an adverse employment action. Rather, defendant disputes that plaintiff was qualified for the position. "The prima facie burden of showing that a plaintiff is qualified can be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Saha v. Ohio State Univ.,* 10th Dist. No. 10AP-1139, 2011-Ohio-3824, ¶ 49, citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-576 (6th Cir.2003). Inasmuch as plaintiff had previously been employed by OSU as a MRW II, the court finds that plaintiff was qualified for the position.

{¶ 18} Further, to the extent that defendant maintains that plaintiff may recover only if the adverse employment action was "solely" due to his disability, the Sixth Circuit Court of Appeals recently decided that the "sole cause" requirement in an ADA case is

---

[3]Ohio courts often look to the ADA for assistance in interpretation of Ohio law. *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 571 (1998).

improper.[4]  However, even if the court were to find that the delay in providing plaintiff with an accommodation was attributable to OSU and that plaintiff's removal was due, at least in part, to his disability, an employer may avoid liability by articulating a legitimate reason for the adverse employment action.  *Talley, supra*; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Once the employer has produced evidence of a nondiscriminatory reason for the adverse action, plaintiff must produce sufficient evidence from which the trier of fact may reasonably reject the employer's explanation.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000).

{¶ 19} Defendant has produced evidence to support several legitimate, nondiscriminatory reasons for plaintiff's discharge.  First and foremost, plaintiff's honesty was discredited when Capps thought plaintiff lied to him.  With regard to plaintiff's honesty, the evidence shows that Capps believed that when plaintiff was interviewed for the MRW I position, he did not address the need for an accommodation in place of the walkie talkie radio even though he knew he was unable to hear the radio. Plaintiff acknowledged at trial that he withheld this information because he did not want to jeopardize his chances of getting the job.  Capps testified that plaintiff "misled" him by stating that he did not need an accommodation.  According to Capps, he thought that this showed a lack in plaintiff's honesty.  Capps explained that he would still have hired plaintiff had he known the extent of his hearing loss but that he would have been able to assist plaintiff in receiving an accommodation earlier if he had known about his needs. Capps believed that the subsequent communication problems could have been avoided had plaintiff simply been honest with him.

---

[4]*See Lewis v. Humboldt Acquisition Corp.*, 6th Cir. No. 09-6381, 2012 U.S. App. LEXIS 10618 (May 25, 2012).  ("At no point * * * has the ADA used the 'solely' because of formulation found in the Rehabilitation Act. * * * The sole-cause standard in the end is a creature of the Rehabilitation Act, and that is where we should leave it.  The standard does not apply to claims under the ADA.")  In that case, the court of appeals found that the district court erred in instructing the jury that plaintiff could only prevail on an ADA discrimination claim if defendant's decision to fire plaintiff was "solely" because of plaintiff's disability.  *Id.*

{¶ 20} Further, plaintiff's failure to return to the job site after the second day of orientation led Capps to doubt plaintiff's honesty.  Capps testified that he was not "thrilled" that plaintiff did not return to FOD and he thought plaintiff should be disciplined because he failed to work a full work day.  While plaintiff testified that the orientation did not end until 3:00 p.m., Capps testified that Brobst returned to the FOD shop around 1:00 p.m., and Barylak testified that the second day of orientation ended around 2:00 p.m.  Capps explained that this incident affected his opinion about plaintiff's credibility. Brobst testified that he had previously worked for Capps and knew that Capps does not respect individuals who lie.

{¶ 21} A second reason relied upon by OSU is Capps' belief that plaintiff did not take pride in his work.  The evidence establishes that plaintiff felt "entitled" to a position at OSU and that he only took the MRW I job so that he could work his way up to a management position.  Lissner has been employed by OSU as the ADA Coordinator since January 3, 2000.  According to Lissner, his job duties at OSU included reviewing disability policies, dispute resolution, and human resources and employment issues. Lissner testified that plaintiff first contacted him when plaintiff's job in the geology department was eliminated as a result of the RIF.  According to Lissner, plaintiff told Lissner that he needed to find plaintiff a new job because he was disabled.  Lissner testified that it was not his responsibility  to find employment for plaintiff, but that if plaintiff needed assistance or an accommodation for the interviewing process, he would help him.  Lissner stated that he thought plaintiff acted as though he was entitled to a job.

{¶ 22} Plaintiff's own testimony confirmed Lissner's opinion of plaintiff's attitude. Plaintiff testified that the MRW I position was "below his skill level" and that he only accepted the MRW I position because his RIF preference was close to expiring. Plaintiff admitted that he hoped to be able to work up to a management position. Further, Barylak testified that plaintiff approached her at the end of the second day of

orientation and told her that he only took the MRW I position while he waited for a management position.

{¶ 23} Defendant presented evidence that plaintiff displayed this "entitled" attitude while working at FOD. Knotts, who in 2007 was employed by OSU as a building maintenance supervisor I, testified that he occasionally supervised plaintiff and plaintiff did not show much enthusiasm for his job. He related one instance where plaintiff was driving a university-owned truck and lightly hit another vehicle. Knotts testified his impression was that plaintiff did not seem to think that hitting another vehicle was a "big deal." (Defendant's Exhibit P.) Similarly, Knotts informed Capps that plaintiff damaged the fireproofing on a ceiling when he used an extension ladder after he had been told not to do so. (Defendant's Exhibit P.) According to Capps, in the aggregate, plaintiff's attitude indicated that he did not care about his job and that he thought it was below his skill level. Furthermore, the evidence shows that plaintiff spent over six hours in the OSU football stadium looking for a room where he needed to perform a work order. Plaintiff admitted that the stadium was located across the street from the FOD shop. Plaintiff testified that he could not find the room using the blueprints given to him and that he spent over six hours looking for it. Plaintiff's explanation was that he did not want to "bother" his supervisor with questions but that he eventually asked Mitchell, who helped him find the room.

{¶ 24} Although defendant also points to plaintiff's untimely completion of PM work orders as a legitimate nondiscriminatory reason for his removal, and there is some evidence that plaintiff's time to complete PM work orders increased when he repeated the same tasks, even after he received his accommodation, the court believes that this was a secondary reason for plaintiff's removal.[5]

{¶ 25} Based upon the evidence, the court finds that plaintiff believed he was "entitled" to a position at OSU and that this belief led to a bad attitude on the job. Capps

---

[5]Defendant introduced the individual work orders in Defendant's Exhibit G. At trial, defendant's Exhibits G, I, and L were admitted over plaintiff's objections.

testified credibly that he believed plaintiff lied to him.  Further, plaintiff's actions on the job show that he was not a dedicated worker.  In short, the court finds that defendant had legitimate nondiscriminatory reasons for plaintiff's removal.

{¶ 26} Since defendant has articulated legitimate nondiscriminatory reasons for its action, the burden shifts back to plaintiff to prove by a preponderance of the evidence that the reason offered by defendant was not the true reason by merely a pretext for discrimination.  *McDonnell Douglas, supra.*  Plaintiff "may challenge the credibility of the employer's explanation by demonstrating: '(1)that the proffered reason had no basis in fact, (2) that the proffered reason did not actual motivated the discharge, or (3) that the proffered reason was insufficient to motivate the discharge.'" *Owens v. Boulevard Motel Corp.,* 10th Dist. No. 97APE12-1728 (Nov. 5, 1998), quoting *Frantz v. Beechmont Pet Hosp.,* 117 Ohio App.3d 351, 359 (1st Dist.1996); *see also Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994).

{¶ 27} Plaintiff argues that Capps' animosity towards plaintiff is evidence of pretext.  Plaintiff testified that Capps was not "very friendly" when he approached plaintiff to inquire why he did not return to FOD after the orientation.  However, plaintiff admitted that Capps told him that he did not believe plaintiff's story about not hearing the announcement at the end of orientation.  Plaintiff was expected to work a full day and when the orientation ended early, he should have returned to FOD.  Further, Brobst, who had past work experience with Capps, testified that he knew that Capps expected his employees to be honest in their work.  The court finds that Capps' testimony is credible that he believed plaintiff lied to him about why he did not return to FOD after the second day of orientation.

{¶ 28} Plaintiff argues that Capps became frustrated when he learned, about a month after plaintiff began working, that plaintiff was unable to communicate with the walkie talkie radio.  The court finds that Capps became "frustrated" because plaintiff failed to disclose that fact during the interview and wasted valuable time that could have

been used to arrange an appropriate accommodation. On the heels of the orientation incident, Capps had grounds to question plaintiff's honesty.

{¶ 29} For the reasons stated above, the court finds that Capps' perception of plaintiff was not due to his disability but because of his attitude and integrity. In fact, it was Capps who arranged a meeting with Lissner to discuss an accommodation as soon as he learned that plaintiff could not hear the radios. Further, Capps stated credibly that he would still have hired plaintiff for this position even if he had known this information at the interview but that he could have assisted plaintiff in receiving an accommodation earlier in his employment. Capps was also instrumental in arranging for plaintiff to retain his previous rate of pay when he became a MRW I. Plaintiff testified that the MRW I was posted at a lower salary than his previous job in the geology department but that Capps was able to increase plaintiff's pay. Capps testified that he made a "strong pitch" to keep plaintiff's salary at the same level he had in the geology department and Calamari confirmed Capps requested increase in plaintiff's pay rate. Capps' actions in helping plaintiff do not indicate any animosity.

{¶ 30} Plaintiff also alleges that his probationary removal was based on plaintiff's hearing both because Capps' mid-probationary review was conducted before plaintiff received his accommodation and because the final evaluation contained multiple drafts defendant decided to terminate plaintiff and then created the documentation to support its decision. Capps, however, testified that a mid-probationary review of plaintiff was most likely conducted in either August or September 2007 but that he cannot recall any details about such evaluation. Additionally, the September 10, 2007 email from Becca Hubbard, a human resources consultant for FOD, to Capps stating that she spoke "at length with Jan about the possibility of a probationary removal for Jim," does not prove that Capps had already decided at this time to remove plaintiff. (Plaintiff's Exhibit 4.) Further, both Chitra Iyer, an OSU employee in its central human resources department and Ladonia Coatney, an employee in FOD's human resource department, testified that the purpose of the probationary period is for management to assess whether the

probationary employee is a good fit for the position. The 180-day probationary period helps management see if the employee demonstrates the proper skill set for the position. Accordingly, the court finds that Capps evaluated plaintiff's performance throughout his probationary period, both before and after he had the accommodation.

{¶ 31} Regarding plaintiff's final evaluation, Capps testified that several drafts were completed for plaintiff and that he communicated with Peggy Barylak about the evaluation. Capps explained that Barylak has offered clarifications on performance evaluations in the past. Barylak, a 13-year employee in FOD's human resources department, testified that she reviews most employee evaluations; that she offers assistance to supervisor's completing the evaluation; and that maintenance and technical supervisors tend to ask many questions about evaluations. Barylak stated that her goal is to ensure that evaluations are fair and accurate. Further, she testified that she may review a probationary evaluation with the supervisor if the employee is going to be removed from the position. She testified that Capps expressed concerns about plaintiff's timeliness but that when she reviewed Capps' draft it stated that plaintiff met "quantity and timeliness." (Defendant's Exhibit U.) As a result, Capps revised plaintiff's evaluation accordingly. The court finds that this testimony is credible and that Capps' initial performance evaluation was a draft which Barylak reviewed for accuracy.

{¶ 32} Further, plaintiff argues that his probation should have been extended since his accommodation was not in place for most of his probationary period. Although Capps made an effort to extend plaintiff's probationary period because he was unsure if the accommodation had been fully implemented, Barylak responded that probation could not be extended unless the employee had been on a leave of absence. (Defendant's Exhibit U.) Moreover, as stated above, defendant's true reasons for plaintiff's probationary removal were plaintiff's sense of entitlement on the job and Capps' impression that plaintiff lacked integrity and honesty in his work. Accordingly,

plaintiff has failed to prove that defendant's claimed inability to extend his probation was a pretext for discrimination.

{¶ 33} Defendant asserts that one of its reasons for removing plaintiff was because of plaintiff's increased time in completing PM work orders even after plaintiff received his accommodation. Plaintiff argues that the work orders defendant cites to show an increase in time do not compare the same work and therefore are evidence of pretext. However, as noted above, the court has not given great weight to the timeliness issue inasmuch as defendant has provided a legitimate nondiscriminatory reason for plaintiff's removal. Moreover, "[a] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Knepper v. Ohio State Univ.,* 10th Dist. No. 10AP-1155, 2011-Ohio-6054, ¶ 12, citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see also Northern v. Med. Mutual of Ohio*, 8th Dist. No. 86527, 2006-Ohio-1075, ¶ 19. Accordingly, plaintiff's argument that his timeliness in performing work orders was a false reason for his removal is not dispositive of his claims. While defendant may have used plaintiff's timeliness as a reason for removing plaintiff, the court finds that defendant provided several other legitimate nondiscriminatory reasons that plaintiff has failed to prove were pretext for discrimination.

{¶ 34} The court finds that defendant's reasons for removing plaintiff are credible, including his apathetic attitude towards his job and his dishonesty. Plaintiff has not shown that defendant's legitimate reasons are not credible nor has he shown that discrimination was the reason for his removal. Plaintiff has failed to present evidence of pretext. Simply stated, plaintiff did not prove by a preponderance of the evidence that defendant's decision was because of plaintiff's disability.

{¶ 35} For the foregoing reasons, the court concludes that plaintiff has failed to prove his claims by a preponderance of the evidence. It is recommended that judgment be rendered in favor of defendant accordingly.

{¶ 36} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i).  If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed.  A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
LEWIS F. PETTIGREW
Magistrate

cc:

Robert D. Noble                         Velda K. Hofacker
261 South Front Street                  Assistant Attorney General
Columbus, Ohio 43215                    150 East Gay Street, 18th Floor
                                        Columbus, Ohio 43215-3130

007
Filed July 2, 2012
To S.C. Reporter January 16, 2013